**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| TC INVESTMENTS, CORP., *et al.*,<br><br>**Plaintiffs**,<br><br>**v.**<br><br>SYDNEY BECKER, *et al.*,<br><br>**Defendants.** | **CIVIL NO.** 08-1320 (FAB) |

**OPINION AND ORDER**[1]

BESOSA, District Judge.

Before the Court is the motion of plaintiffs TC Investments, Corp. ("TCI") and Caribbean Property Group, L.L.C. ("CPG") to dismiss the counterclaim filed by co-defendants Sidney Becker, Wilma Becker Shapiro and Judith Becker Rubin (collectively, "defendants"), (Docket No. 25), as well as defendants' motion to dismiss the amended complaint. (Docket No. 45.)

For the reasons discussed below, the Court hereby **DISMISSES WITHOUT PREJUDICE** defendants' counterclaim and **DENIES** defendants' motion to dismiss the amended complaint.

---

[1] Christine D'Auria, a second year student at Northwestern Law School, assisted in the preparation of this Opinion and Order.

## FACTUAL BACKGROUND

### I. FACTUAL ALLEGATIONS IN THE AMENDED COMPLAINT

Plaintiff TCI is "a Puerto Rico corporation with its principal place of business in Puerto Rico." (Docket No. 36 at 2.) Jorge Torres-Caratini ("Mr. Torres-Caratini") is TCI's sole shareholder and president. Id. at 4. Involuntary plaintiff CPG "is a limited liability corporation organized and existing under the laws of the state of Delaware[,] . . . [and its] principal place of business is New York, New York." Id. at 2. Defendants Sydney Becker, Wilma Shapiro, and Judith Becker are residents and citizens of Pennsylvania, Georgia, and Maryland, respectively. Id. at 2-3.

Together, defendants own shares in four limited liability companies (collectively, "the LLC's") in Puerto Rico. (Docket No. 36 at 3.) Plaintiffs allege that the principal place of business of the LLC's is Puerto Rico, where they have conducted business exclusively for many years, and that defendants own shopping centers as well as residential and commercial properties. Id. Defendants' investments in two of the LLC's "generated millions of dollars in dividends and benefits, all of which have been paid in Puerto Rico." Id.

Beginning in 2003, defendants expressed a willingness to sell their business interests in the Puerto Rico LLC's, and Mr. Torres-

Caratini and CPG made offers to purchase the LLC's. (Docket No. 36 at 3-4.) After CPG offered to purchase defendants' shopping center operations in or about August of 2007, defendants sent a facsimile dated August 15, 2007, from Pennsylvania to Puerto Rico indicating that they would entertain the offer to sell if the offer included all of their Puerto Rico holdings. Id. at 4. In October of 2007, TCI and CPG offered to purchase defendants' Puerto Rico holdings in compliance with the defendants' August facsimile conditions. Id. Defendants, via a letter dated November 22, 2007, made a counter-offer to TCI and CPG indicating that they would sell the Puerto Rico holdings to CPG and TCI provided that the net proceeds from the sale of all the properties were $27,650,000, and that the buyers would indemnify the sellers against any further liabilities. (Docket No. 36-2 at 2.)

In response, TCI and CPG sent a letter dated December 4, 2007, to defendants agreeing to the terms and conditions set forth by defendants:

> After proper review and consulting with First Bank and [CPG], I am pleased to inform you that your counter offer for the sale of your 95% equity interest in [two of defendants' LLC's] and 100% equity interest in [one LLC]. . . is accepted. This acceptance is made together with CPG's acceptance . . . adding up a total net proceeds of $27,650,000.00 for all your Puerto Rico properties, as you requested.

> As part of our acceptance to your offer, we agree to assume all the liabilities of [the LLC's] and to release you from any further business liabilities . . . .
>
> Upon your execution of this letter of intent, we will prepare and submit for your revision a draft of the Agreement of Purchase and Sale of Equity Interests in [three of the LLC's], after which we will enter into a due diligence period of 60 days to complete the revision and preparation of all the documentation needed for closing, which shall occur not later than 30 days after expiration of the due diligence.
>
> Please execute and return this original at the bottom to acknowledge your acceptance of the terms of this offer, and keep a copy for your records.

(Docket No. 36-2 at 3.)

Mr. Torres-Caratini's signature appears on the bottom of the letter of intent, but the signature line for co-defendant Sidney Becker is blank. See id. According to the terms of the acceptance and counter-offer, CPG was to purchase the real estate of one LLC and TCI would purchase the equity interest of the other three LLC's. (Docket No. 36 at 5.)

**II. FACTUAL ALLEGATIONS IN DEFENDANTS' COUNTERCLAIM**

Jorge Torres-Caratini is a resident and businessman of San Juan, Puerto Rico, and TC Investments Corp. is his alter ego. (Docket No. 22 at 7.) TCI was "organized under the laws of Puerto Rico with [its] principal place of business in Puerto Rico." Id. Co-defendant Sidney Becker is a resident of Pennsylvania, Wilma

Becker Shapiro is a resident of Georgia, and Judith Becker Rubin is a resident of Florida. Id. at 8. Defendants own 95% of Plaza San Francisco Investments, LLC and Las Piedras Investments, LLC, and Mr. Torres-Caratini owns the remaining 5%. Id. Defendants also own 100% of Rio Grande Investments, LLC and Las Piedras Development, LLC (collectively, the four companies hereinafter "the LLC's"). Id. The LLC's are "Limited Liability Companies created under the Delaware Limited Liability Company Act." Id.

Co-defendant Sidney Becker requested in 1997 that Mr. Torres-Caratini serve as administrator of Plaza San Francisco Investments, LLC. (Docket No. 22 at 8-9.) In 1997 and 1998, Mr. Torres-Caratini recommended that defendants acquire land in Las Piedras and Rio Grande, Puerto Rico, respectively, for development of two shopping centers. Id. at 9. Las Piedras Investment, LLC and Rio Grande Investments, LLC, two of defendants' LLC's, were created under Delaware law to acquire and develop the shopping centers in Las Piedras and Rio Grande. Id. Mr. Torres-Caratini was in charge of the acquisition, development, and operations and had absolute control of the LLC's and properties. Id.

"[T]he shopping centers were not adequately kept and consequently devalued" because of acts, omissions and results under Mr. Torres-Caratini's supervision and control at San Francisco and

Las Piedras Shopping Centers. (Docket No. 22 at 10.) From the acts, omissions, and results listed in defendants' counterclaim, defendants contend that Mr. Torres-Caratini "mismanaged the shopping centers, incurred in numerous conflicts of interests [sic] and continuously failed to exercise the due care and the good business person judgment which he was obligated to exercise." Id. at 9. Furthermore, the Rio Grande shopping center's development was delayed, incurring "huge cost overruns and interest expenses." Id. at 11.

Additionally, Mr. Torres-Caratini fraudulently received commissions of over $350,000 for leases obtained for the shopping centers, (Docket No. 22 at 11), and he used the LLC's and defendants' information to entice a third party to combine with him to acquire defendants' properties. Id. at 12. He also failed to provide "adequate information to [defendants], refused to comply with specific orders and requests of [defendants], and outright lied to them about the status of the operations." Id. at 11. Defendants contend that Mr. Torres-Caratini "devaluated the [defendants'] properties to try to acquire them . . . at a cheap price," id., and that the projects that Mr. Torres-Caratini mismanaged "resulted in serious losses and/or made a very low return on the [defendants'] investment." Id.

## PROCEDURAL BACKGROUND

### I. PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs contend that they entered into a contract with defendants to buy their equity interest in the Puerto Rico LLC's and that defendants "walked away" from the agreement. (Docket No. 36 at 5.) The amended complaint alleges a breach of contract claim for damages of more than ten million dollars ($10,000,000). Id. Plaintiffs also assert a second claim, for a bad faith withdrawal or termination of negotiations, or in the alternative, "for the wrongful and bad faith failure to negotiate," that calculates no damages. Id. at 6.

On March 1, 2010, defendants moved to dismiss plaintiffs' amended complaint, arguing that: (1) plaintiffs' *culpa in contrahendo* claim fails to satisfy the amount in controversy required for diversity jurisdiction; and (2) the amended complaint fails to state a claim under Rule 12(b)(6) for breach of contract and for *culpa in contrahendo*. (Docket No. 45.) Plaintiffs opposed the motion. (Docket No. 48.)

### II. DEFENDANTS' COUNTERCLAIM

Defendants' counterclaim alleges that Mr. Torres-Caratini, the alter ego of plaintiff TCI, breached his fiduciary duties owed directly to the defendants, took negligent actions that devalued

defendants' properties, and thus defrauded the defendants. (Docket No. 22 at 10-12.)

Plaintiffs cite two grounds for dismissing defendants' counterclaim: (1) failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6); and (2) failure to join an indispensable party as required by Federal Rule of Civil Procedure 19 pursuant to Federal Rule of Civil Procedure 12(b)(7). (Docket No. 25.) Plaintiffs contend that defendants' counterclaim endeavors to redress a "laundry list" of injuries that Mr. Torres-Caratini caused to defendants' LLC's. (Docket No. 25 at 3.) As such, plaintiffs argue that shareholders have no cause of action for damages caused to a corporation in either Delaware or Puerto Rico and the counterclaim should be dismissed. Id. at 4-5. In the alternative, plaintiffs argue that the counterclaim constitutes a derivative cause of action that requires a corporation to be joined as a party to the action. Id. at 5. Plaintiffs move to dismiss the counterclaim under Rule 19 because defendants failed to join the LLC's as parties. Id.

Defendants opposed plaintiffs' motion. (Docket No. 34.) Defendants respond that the counterclaim contains claims of

violations of Mr. Torres-Caratini's fiduciary duties[2] towards defendants, not towards their LLC's. (Docket No. 34 at 2.) Moreover, the counterclaim alleges gross negligence and fraud, which are more than just a "mere laundry list" of injuries and are not derivative in nature. Id. Defendants contend that Mr. Torres-Caratini breached his fiduciary duties to, and defrauded, defendants by devaluating their properties, and that the motion to dismiss should be denied. Id. at 7.

---

[2] In their Opposition to the Motion to Dismiss, defendants identify the following fiduciary duties that business associates owe to one another:

> (1) To act with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like positions;
> (2) To discharge the duties affecting their relationship in good faith with a view to furthering the interests of one another as to the matters within the scope of the relationship;
> (3) To disclose and not withhold from one another relevant information affecting the status and affairs of the relationship;
> (4) To not use their position, influence or knowledge respecting the affairs and organization that are subject to the relationship to gain any special privilege or advantage over the other person or persons involved in the relationship.

(Docket No. 34 at 6.)

**DISCUSSION**

**I. MOTION TO DISMISS AMENDED COMPLAINT STANDARD**

Because defendants' motion to dismiss was filed after their answer to the complaint, the Court will evaluate their motion under the Fed.R.Civ.P. 12(c) standard, Fed.R.Civ.P. 12(h)(2)(B), which "is the same as that for a motion to dismiss under Rule 12(b)(6)." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007). To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)). The complaint must contain factual allegations that "raise a right to relief above the speculative level," or in other words, plaintiffs must "nudge[] their claims across the line from conceivable to plausible."[3] Twombly, 550 U.S. at 570.

The Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiffs' favor. See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st

[3] Notably, the U.S. Supreme Court "disavowed the oft-quoted language of Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that a 'complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in relief of his claim which would entitle him to relief.'" Margo Caribe, Inc., 490 F.3d at 95-96 (citing Twombly, 550 U.S. at 562-63).

Cir. 1990). The Court need not credit, however, "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the complaint's allegations. Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). When opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." McCoy v. Massachusetts Institute of Tech., 950 F.2d 13, 22 (1st Cir. 1991). Plaintiffs are responsible for putting their best foot forward in an effort to present a legal theory that will support their claim. Id. at 23 (citing Correa-Martinez, 903 F.2d at 52). Plaintiffs must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).

## II. MOTION TO DISMISS AMENDED COMPLAINT

### A. THE AMOUNT IN CONTROVERSY

Defendants challenge the Court's subject matter jurisdiction based on an alleged failure to meet the amount in controversy required for diversity jurisdiction. (Docket No. 45 at 19.) A district court has original jurisdiction of all civil actions between citizens of different states where the matter in controversy exceeds the sum of $75,000.00. 28 U.S.C. 1332(a). "A

party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed.R.Civ.P. 18. "[T]he Supreme Court's longstanding test for determining whether a party has met the amount-in-controversy minimum [is] 'that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith.'" Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001) (citing St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283 (1938)). "[A] plaintiff's general allegation of damages that meet the amount requirement suffices unless questioned by the opposing party or the court." Spielman, 251 F.3d at 5.

Plaintiffs' amended complaint contains claims for two separate causes of action. (Docket No. 36 at 5.) The first, a breach of contract claim, calculates damages "in excess of ten million dollars ($10,000,000)," id., which well exceeds the jurisdictional requirement. The second claim, for a bad faith withdrawal or termination of negotiation, or in the alternative, for the wrongful and bad faith failure to negotiate, calculates no damages. Id. at 5-6. Although the second claim does not, standing alone, meet the diversity jurisdictional requirement, the claims may be aggregated to satisfy the required $75,000 jurisdictional amount. See 28 U.S.C. § 1332.

While defendants challenge that the *culpa in contrahendo* claim would not exceed the statutory minimum of $75,000, they do not challenge plaintiffs' first claim for more than $10,000,000.00. Even if the *culpa in contrahendo* claim by itself does not exceed $75,000, plaintiffs' breach of contract claim for more than $10,000,000 suffices for the amount-in-controversy. A party may join, "as independent or alternative claims, as many claims as it has against an opposing party," Fed.R.Civ.P. 18(a), and the Supreme Court has firmly established that "in determining whether the amount-in-controversy requirement has been satisfied, a single plaintiff may aggregate two or more claims against a single defendant, even if the claims are unrelated." Exxon Mobil Corp. v. Allapattah Servs., 545 U.S. 546, 585 (2005) (citing Edwards v. Bates County, 163 U.S. 269, 273 (1896)). This Court thus has jurisdiction to entertain the claims pleaded under 28 U.S.C. § 1332 because, as the aggregation of plaintiffs' two claims satisfies the diversity jurisdictional requirement, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and complete diversity exists between the plaintiffs and defendants. Accordingly, the amended complaint should not be dismissed for lack of subject matter jurisdiction.

**B. CHOICE OF LAW**

To examine whether a claim for breach of contract exists, the Court must first determine the controlling law. A.M. Capen's Co. v. American Trading & Prod. Corp., 74 F.3d 317, 319 (1st Cir. 1996). In diversity jurisdiction cases, federal courts must apply the substantive law of the forum where the action is filed. Hanna v. Plumer, 380 U.S. 460, 471 (1965); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Furthermore, "[a] federal court sitting in a diversity case must apply the choice of law rules of the forum state." New Ponce Shopping Ctr v. Integrand Assurance Co., 86 F.3d 265, 267 (1st Cir. 1996) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-98 (1941)). Thus, the conflicts law of Puerto Rico, the forum in this case, controls. See Bonn v. Puerto Rico Int'l Airlines, Inc., 518 F.2d 89, 91 (1st Cir. 1975).

Puerto Rico "has approved the 'dominant or significant contacts' test for contract and tort actions." New Ponce, 86 F.3d at 267 (citing A.M. Capen's Co., 74 F.3d at 320). Under the "dominant or significant contacts" test, "recourse to the Restatement (Second) of Conflict of Laws is appropriate," A.M. Capen's Co., 74 F.3d at 320, to determine whether "the laws of the jurisdiction with the most significant contacts to the disputed issues will apply." New Ponce, 86 F.3d at 267.

> Under Section 188 of the Restatement, absent a contractual choice of law [by the parties], the contacts to be taken into account [to determine the applicable law] in a contract action include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

A.M. Capen's Co., 74 F.3d at 320 (citing Restatement § 188 (1971)). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement § 188 (1971).

In this case, the places of contracting and negotiating occurred in part in Puerto Rico as well as in Pennsylvania and New York. Communications between plaintiffs and defendants regarding the offers, counter-offers, terms, and conditions for defendants' Puerto Rico properties transpired via letters and facsimiles sent between Pennsylvania, Puerto Rico, and New York. (Docket No. 36 at 4; Docket No. 36-2 at 1-4.) "However, standing alone, the place of contracting is a relatively insignificant contact." A.M. Capen's Co., 74 F.3d at 320 (citing Restatement § 188).

The location of the subject matter of the contract points to Puerto Rico. The four LLC's owned by defendants that have been managed by Mr. Torres-Caratini are all located, and are purported to have their principal place of business, in Puerto Rico. (Docket

No. 36 at 3.) For many years the LLC's have conducted business exclusively in Puerto Rico, and defendants' investments in two of the LLC's "have generated millions of dollars in dividends and benefits, all of which have been paid in Puerto Rico." Id.

Finally, the parties' "domicil, residence, nationality, place of incorporation and place of business" varies. Plaintiff TCI "is a Puerto Rico corporation with its principal place of business in Puerto Rico." (Docket No. 36 at 2.) Involuntary plaintiff CPG "is a limited liability corporation organized and existing under the laws of the state of Delaware . . . [and its] principal place of business is New York, New York." Id. Co-defendants Sydney Becker, Wilma Shapiro, and Judith Becker are residents and citizens of Pennsylvania, Georgia, and Maryland, respectively. Id. at 2-3. Other than the fact that the LLC's were "created under the Delaware Limited Liability Company Act," (Docket No. 22 at 8), there is no common domicile. However, all four of defendants' LLC's and plaintiff TCI are located and conduct business exclusively in Puerto Rico. "Puerto Rico has an interest in . . . citizens of Puerto Rico[,] . . . local taxpayer[s], business[es], and employer[s]." Bonn, 518 F.2d at 92.

Balancing the interests of the parties and the contacts between Puerto Rico and Delaware, New York, Pennsylvania, Georgia,

or Maryland results in a substantial tilt towards Puerto Rico. Part of the alleged contracting and negotiating occurred in Puerto Rico, the subject matter--the four LLC's--of the alleged contract is located in Puerto Rico, and TCI as well as defendants' LLC's are located and have places of business in Puerto Rico. Even though CPG was incorporated in Delaware and the four LLC's appear to have been organized and exist under Delaware law, Delaware does not have comparable substantial contacts to Puerto Rico. Thus, under the 'dominant or significant contacts' test, Puerto Rico law governs the alleged contract in this case. See, e.g., New Ponce, 86 F.3d at 267-68; see also A.M. Capen's Co., 74 F.3d at 322.

Plaintiffs argue instead that Delaware law should apply under the "internal affairs" doctrine. (Docket No. 48 at 7.) That choice-of-law principle defines "internal affairs" as "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders," Edgar v. MITE Corp., 457 U.S. 624, 645 (1982), and states that "[g]enerally, 'when the subject is liability of officers and directors for their stewardship of the corporation, the law presumptively applied is the law of the place of incorporation.'" Wadsworth, Inc. v. Schwarz-Nin, 951 F.Supp. 314, 320 (D.P.R. 1996) (citing Resolution Trust Corp. v. Chapman, 29 F.3d 1120, 1122 (1st Cir.1994)). While

"neither the Puerto Rican courts nor the Puerto Rican legislature has thoroughly addressed the question of what law must apply to piercing the corporate veil," to be addressed below in plaintiffs' motion to dismiss defendants' counterclaim, the "internal affairs" doctrine does not apply to plaintiffs' breach of contract claim. Wadsworth, 951 F.Supp. at 320. This is because, "[w]ith respect to tort and contract cases, the Puerto Rican courts have adopted the'most significant contacts' test of the Second Restatement." Id. (citing A.M. Capen's Co., 74 F.3d at 321; Fornaris v. Amer. Surety Co. of N.Y., 93 D.P.R. 29 (1966)).

**C. BREACH OF CONTRACT CLAIM**

"To properly assert a claim for breach of contract, a party must sufficiently allege (1) a valid contract, (2) breach of that contract, and (3) resulting damages." First Medical Health Plan, Inc. v. Carmark PCS Caribbean, Inc., 681 F. Supp. 2d 111, 116 (D.P.R. 2010). In their motion to dismiss the amended complaint, defendants allege that plaintiffs' breach of contract claim fails because plaintiffs did not set forth the required elements demonstrating that a contract actually existed. (Docket No. 45 at 4.) "Under Puerto Rico law, a contract has three elements: consent, a definitive (and legal) object, and consideration." Citibank Global Markets, Inc. v. Rodriguez-Santana, 573 F.3d 17, 25

(1st Cir. 2009). Specifically, defendants argue that TCI and CPG did not all consent to the defendants' demands. In other words, that there was no "meeting of the minds." (Docket No. 45 at 12.)

The amended complaint alleges that defendants made a counter-offer to TCI and CPG indicating that they would sell the Puerto Rico holdings to CPG and TCI provided that the net proceeds from the sale of all the properties were $27,650,000, and that the buyers would indemnify the sellers against any further liabilities. (Docket No. 36-2 at 2.) Plaintiffs then agreed to those specific terms and conditions in a signed letter dated December 4, 2007, in which Mr. Torres-Caratini wrote, "[a]fter proper review and consulting with First Bank and [CPG], I am pleased to inform you that your counter offer for the sale of your 95% equity interest in [two of defendants' LLC's] and 100% equity interest in [one LLC] . . . is accepted." Id. at 3. Mr. Torres-Caratini further explained that CPG also accepted the counter-offer, which would total the "net proceeds [at] $27,650,000.00 for all [of the] Puerto Rico properties, as [defendants] requested." Id. Then Mr. Torres-Caratini wrote, "[a]s part of our acceptance to your offer, we agree to assume all the liabilities of [the LLC's] and to release you from any further business liabilities." Id.

Defendants argue that further language in the December 4, 2007 letter, coupled with Mr. Sydney Becker's failure to sign the letter, evidences that no consent existed and no agreement was formed between the parties. (Docket No. 45 at 12-15.) Taking the amended complaint's factual allegations as true, however, plaintiffs have sufficiently alleged a set of facts that demonstrates mutual consent. Under Puerto Rico law, "the consent of the contracting parties is an essential element of a contract. 4 P.R. Laws Ann., tit. 31, § 3391. 'Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract.'" Marrero-Garcia v. Irizarry, 33 F.3d 117, 122 (1st Cir. 1994) (citing 31 P.R. Laws Ann. tit. 31, § 3401). In Puerto Rico, "an agreement can be binding without executed documentation if, inter alia, the parties have a 'meeting of the minds expressed through the offer and the acceptance.'" Ysiem Corp. v. Commercial Net Lease Realty, Inc., 328 F.3d 20, 23 (1st Cir. 2003) (citing Producciones Tommy Muñiz, Inc. v. Comite Organizador de los VIII Juegos Panamericanos, 13 P.R. Offic. Trans. 664 (1982)[4]). Moreover, "it is not necessary for an

[4] "The official translations of many Puerto Rico Supreme Court cases cited . . . do not contain internal page numbers. Accordingly, we cannot include pin-point citation references for those cases." Citibank Global Markets, Inc. v. Rodriguez-Santana, 573 F.3d 17 (1st Cir. 2009).

offer to specify every detail, if such details can be ascertained from other sources, and the parties were clear about them." Citibank Global Markets, Inc. v. Rodriguez Santana, 573 F.3d 17, 25 (1st Cir. 2009).

Plaintiffs have alleged sufficient facts "regarding each material element necessary to sustain recovery under some actionable theory," Gooley, 851 F.2d at 514, even though co-defendant Sydney Becker did not sign the December letter of intent and the last paragraph of the letter referenced further actions and terms to be worked out. It is plausible that all parties consented to a sale price of $27,650,000 for defendants' Puerto Rico properties, and that the buyers would indemnify the sellers against any further liabilities. These terms could plausibly be the "object" and the "cause" that were to constitute the offer, and they were offered and accepted, constituting a contract.

As plaintiffs have alleged sufficient facts that could plausibly satisfy the required elements for a breach of contract claim, dismissal of the amended complaint is unwarranted.

**D. *CULPA IN CONTRAHENDO* CLAIM**

Even if plaintiffs did fail to allege a plausible entitlement to relief as to their breach of contract claim, "[t]he mere determination that there is no contract does not absolve the

withdrawing party from all liability . . . [I]n a civil code system there is a possibility of extra contractual liability." Shelley v. Trafalgar House Public Ltd. Co., 977 F. Supp. 95, 97 (D.P.R. 1997). Defendants move to dismiss plaintiffs' amended complaint for failure to support a cause of action under the *culpa in contrahendo* doctrine. (Docket No. 45 at 15.) Puerto Rico recognizes the *culpa in contrahendo* doctrine as "an extra contractual cause of action pursuant to Article 1802 of the Puerto Rico Civil Code." Shelley, 977 F. Supp. at 98 n.6. Under *culpa in contrahendo*, some "negotiations toward an agreement can . . . give rise to mutual expectations that the parties will bargain in good faith and refrain from misconduct." Ysiem, 328 F.3d at 24.

To defeat defendants' motion to dismiss, plaintiffs must have a plausible claim that defendants' unjust withdrawal of negotiations gives rise to liability under *culpa in contrahendo*. Shelley, 977 F. Supp. at 97. This Court must determine whether plaintiffs have set forth sufficient "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under" the *culpa in contrahendo* doctrine. See Gooley, 851 F.2d at 514. It must specifically decide whether plaintiffs' amended complaint sets forth factual allegations sufficient to find "the circumstances of the interruption" that

support a *culpa in contrahendo* claim. See Tommy Muñiz, 13 P.R. Offic. Trans. 664.

The leading case in Puerto Rico, Tommy Muñiz, set out a "rather general test dependent on the circumstances" to ascertain an unjustified or arbitrary interruption of negotiations. Ysiem, 328 F.3d at 24. "The *culpa in contrahendo* test is not very precise and the courts appear reasonably cautious in applying a doctrine that could, if applied too freely, chill negotiations rather than facilitate them." Id. Moreover, the Supreme Court of Puerto Rico labeled *culpa in contrahendo* as a restrictive doctrine. Shelley, 977 F. Supp. at 98. The court in Tommy Muñiz examined the following factors:

> (1) the development of the negotiations, (2) how did they begin, (3) their course, (4) the conduct of the parties throughout them, (5) the stage at which the interruption took place, (6) the parties' reasonable expectations to form a contract, as well as any other relevant circumstance under the facts of the case submitted to judicial scrutiny.

13 P.R. Offic. Trans. 664.

In their motion to dismiss the amended complaint, defendants assert that plaintiffs' second cause of action should be dismissed because the allegations do not support a cause of action for *culpa in contrahendo*. (Docket No. 45 at 15.) Taking all factual allegations in the amended complaint as true, however,

plaintiffs set forth a sufficient factual basis to determine that the defendants "walked away and refused to allow TCI to purchase the equity interest in [the LLC's]" in bad faith. (Docket No. 36 at 5.) Plaintiffs allege that the negotiations between the parties began in 2003, when the defendants "expressed a desire to entertain offers to purchase their business interests in Puerto Rico." Id. at 3. Those negotiations also occurred four years later in 2007, involved direct communication between the parties via letters and facsimiles, and included offers, counter-offers, and acceptances. Id. at 3-5. Plaintiffs' amended complaint alleges that defendants "walked away" from the negotiations after TCI's December 4, 2007 acceptance letter. Id. at 5. Given the development and course of the negotiations, the conduct of the parties, and the stage at which the interruption took place, plaintiffs' well-pleaded complaint alleges facts supporting the circumstances outlined in Tommy Muñiz that could plausibly lead to recovery under the *culpa in contrahendo* theory. Dismissal under 12(b)(6) is therefore unwarranted.

**III. MOTION TO DISMISS COUNTERCLAIM STANDARD**

A counterclaim must be at least as specific as a complaint. See, e.g., U.S. Fidelity & Guaranty Co. v. Gabriel Fuentes Jr. Constr. Corp., 394 F. Supp. 2d 440, 442 (D.P.R. 2005) (denying

motion to dismiss counterclaim because the counterclaim met the well-pleaded complaint standard). To survive a motion to dismiss, therefore, a counterclaim must allege the same "plausible entitlement to relief" as the complaint under the 12(b)(6) and 12(c) standard. See Rodriguez-Ortiz, 490 F.3d at 95 (quoting Twombly, 127 S.Ct. at 1967).

**IV. MOTION TO DISMISS COUNTERCLAIM**

**A. EXISTENCE OF A CAUSE OF ACTION**

Defendants' counterclaim alleges that Mr. Torres-Caratini, the alter ego of plaintiff TCI, breached his fiduciary duties owed directly to the defendants, took negligent actions that devalued defendants' properties, and thus defrauded the defendants. (Docket No. 22 at 10-12.) Plaintiffs contend that the counterclaim seeks to redress injuries that Mr. Torres-Caratini allegedly caused to the LLC's and argue that neither Delaware nor Puerto Rico gives shareholders such a cause of action for damages caused to corporations. (Docket No. 25 at 4.)

Defendants allege that Mr. Torres-Caratini, acting as administrator of a shopping center owned 100% by one of defendants' LLC's and having absolute control of the acquisition, development, and operations of the LLC's and those properties, "mismanaged the shopping centers, incurred in numerous conflicts of interests and

continuously failed to exercise the due care and the good business person judgment which he was obligated to exercise." (Docket No. 22 at 8-9). Defendants also allege that Mr. Torres-Caratini defrauded them "through insidious machinations" that "devaluated the Becker's properties to try to acquire them from the Beckers at a cheap price." Id. at 11. Moreover, defendants contend that Mr. Torres-Caratini breached his fiduciary duties "towards the Beckers and the LLC's" in addition his management duties. Id. at 9. The issue that this Court must decide is whether Puerto Rico and Delaware recognize a cause of action for such claims, which ultimately turns on whether the claims are derivative or direct in nature. See Kramer v. Western Pac. Indus., Inc., 546 A.2d 348, 351 (Del. 1988); see also Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 382 (7th Cir. 1990).

In a derivative suit, "the shareholder sues on behalf of the corporation for harm done to it." Kramer, 546 A.2d at 351. "Courts have applied the rationale of derivative suits to limited partnerships along with corporations." Efron v. Embassy Suites (P.R.), Inc., 47 F. Supp. 2d 200, 207-08 (D.P.R. 1999). "Shareholders may also bring direct actions, both as individuals and as a class, for injuries done to them in their individual capacities by corporate fiduciaries." Id. A direct action may be

brought "to redress an injury sustained by, or enforce a duty owed to, the holder." Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031, 1036 n.9 (Del. 2004). The analysis used to distinguish between a derivative and direct action "must be based solely on the following questions: Who suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?" Id. at 1035. "An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action . . . ." Id. at 1036.

This is a question of state law, because "the identity of the real party in interest depends on the law creating the claim." Bagdon, 916 F.2d at 382; see also Gabriel v. Preble, 396 F.3d 10, 13 (1st Cir. 2005) (noting that "in diversity cases a district court must apply the choice of law principles of the forum state"). Puerto Rico's choice-of-law principles apply here because it is the forum in this case, as discussed above. See Gabriel, 396 F.3d at 13. Neither the legislature nor the courts in Puerto Rico have thoroughly addressed the issue of which law must apply to corporate governance cases. See Wadsworth v. Schwarz-Nin, 951 F.Supp. 314, 320 (D.P.R. 1996). The choice of law principle recognized in Wadsworth is the "internal affairs" doctrine. 951 F.Supp. at 320.

Under this doctrine, "which applies the law of the state of incorporation to cases involving corporate governance," Gabriel, 396 F.3d at 13, Delaware law would apply because defendants' four LLC's are incorporated there. (Docket No. 43 at 2.) Moreover, because Puerto Rico corporate law was modeled after Delaware corporate law, the court considers Delaware law for evaluating whether the claims are derivative. See Wiley v. Stipes, 595 F. Supp. 2d 179, 185 (D.P.R. 2009) (citing Gonzalez Turul v. Rogatol Distribs, Inc., 951 F.2d 1, 3 n.4 (1st Cir. 1991) (turning to Delaware corporate law for the test of demand futility in derivative suits because Puerto Rico law does not specifically elaborate those requirements)); see also Marquis Theatre Corp. v. Condado Mini Cinema, 846 F.2d 86, 91 (1st Cir. 1988) (turning to Delaware corporate law to determine the definition of the business judgment rule under Puerto Rico corporate law).

As a general rule, because a corporation and its shareholders are distinct juridical persons, "actions to enforce corporate rights or redress injuries to a corporation cannot be maintained by a stockholder in his own name even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." Pagan v. Calderon, 448 F.3d 16, 28 (1st Cir. 2006) (citation and internal quotation marks

omitted). Shareholders lack "standing to sue in their personal capacities unless the alleged misconduct causes harm to them separate and distinct from the injury inflicted upon the debtor corporation." See id. at 29 (applying Puerto Rico law); see also Kramer, 546 A.2d at 351 ("[T]o set out an individual action, the plaintiff must allege either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder . . . which exists independently of any right of the corporation.") (internal citations and quotations omitted). "Thus, to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation." Kramer, 546 A.2d at 351; see also Pagan, 448 F.3d at 28. "The tenet holds true even if the shareholder is the sole owner of the corporation's stock." Pagan, 448 F.3d at 28.

Exceptions to the general rule exist if the injury "is peculiar to him alone, and . . . does not fall alike upon other stockholders," or "if it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct." Id.; but see Tooley, 845 A.2d at 1038-39 (discrediting the "special injury" concept and the proposition "that an action cannot be

direct if all stockholders are equally affected or unless the stockholder's injury is separate and distinct from that suffered by other stockholders"). If no exception is met, "only the corporation, a receiver, or a stockholder acting derivatively in the corporation's name may sue to redress an injury to the corporation." Id. (citing Bishay v. Am. Isuzu Motors, Inc., 404 F.3d 491, 495 (1st Cir. 2005)).

Following Delaware case law, this Court first looks "to the nature of the wrong and to whom the relief should go." Tooley, 845 A.2d at 1039. Defendants' counterclaim alleges that Mr. Torres-Caratini "mismanaged the shopping centers" (Docket No. 22 at 9); "the shopping centers were not adequately kept and consequently devalued," id. at 10; serious losses and/or very low returns on defendants' investments occurred, id.; Mr. Torres-Caratini breached his fiduciary duties toward the LLC's, id. at 9; Mr. Torres-Caratini used "the LLC's own resources, equipment and personnel to develop his own private plan," id. at 12; and Mr. Torres-Caratini paid services to develop his private plan with LLC's funds. Id. These claims all assert injuries to the defendants' LLC's and/or properties.

Defendants also allege, however, that Mr. Torres-Caratini breached his fiduciary duties toward the [defendants], (Docket

No. 22 at 9); "devaluated the [defendants'] properties to try to acquire them from the [defendants] at a cheap price," id. at 11; paid over $300,000 "to himself and through a third party . . . in violation of Puerto Rico's Realty Law," id.; paid approximately $50,000 to himself in commissions for leases in a property interest that never came into place, id.; "did not provided [sic] adequate information to the [defendants], refused to comply with specific orders and requests of the [defendants], and outright lied to them about the status of operations," id.; and took "actions in breach of his fiduciary duties to the [defendants], without keeping [them] informed, without exercising any affirmative duty of care on the [defendants'] behalf, not sharing [sic] information." Id. at 12. These claims all assert injuries directly to the defendants as individuals.

The Court next looks to whether "[t]he stockholder's claimed direct injury [is] independent of any alleged injury to the corporation." Tooley, 845 A.2d at 1039. Here, all of defendants' injuries stem from the devaluation, serious losses and/or low investment returns, and mismanagement of the defendants' corporate entities, the LLC's. As such, whether or not the duties allegedly breached were owed to defendants as stockholders of the LLC's,

defendants have not demonstrated that they "can prevail without showing an injury to the corporation." See id.

Because defendants' counterclaim "does not allege that any of the individual shareholders sustained a particularized, nonderivative injury that might deflect application of the usual shareholder standing rule or that any other exception pertains," it is a derivative suit. See Pagan, 448 F.3d at 29; see also Gabriel, 396 F.3d at 13. Because defendants' counterclaim is not structured as a direct action, therefore, it cannot move forward for the reasons stated below.

**B. FAILURE TO JOIN UNDER RULE 19**

**1. STANDARDS**

Characterizing a cause of action as derivative has consequences. See Gabriel, 396 F.3d at 13. "Pertinently, it means that the corporation is an indispensable party within the meaning of Fed.R.Civ.P. 19 (which requires the joinder of parties 'needed for just adjudication'). See Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 522-23, 91 L. Ed. 1067, 67 S. Ct. 828 & n.2, (1947) (holding that the corporation is a necessary party in a derivative suit)." Pursuant to Rule 12(b)(7), plaintiffs request dismissal of defendants' counterclaim for failure to join a "necessary party." Fed.R.Civ.P. 12(7). Rule 13, which governs

counterclaims, provides that Rule 19 governs the joinder of parties to counterclaims. Fed.R.Civ.P. 13(h). Rule 19 "provides for the joinder of such 'necessary' parties when feasible . . . [and] for the dismissal of suits when the court determines that the joinder of the 'necessary' parties is not feasible, but that they are, nonetheless, so 'indispensable' that the suit must not be litigated without them." Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008) (citing Fed.R.Civ.P. 19(b)).

**2. FEASIBILITY PURSUANT TO RULE 19(a)**

Joinder is not feasible when the joinder would destroy the Court's subject matter jurisdiction. See Fed.R.Civ.P. 19(a)(1); see, e.g., B. Fernandez & Hnos, Inc. v. Kellogg USA, Inc., 516 F.3d 18, 27 n.6 (1st Cir. 2008). The Court here analyzes its subject matter jurisdiction under both original and supplemental jurisdiction. Congress has conferred original subject matter jurisdiction on Article III courts in "federal question" cases and controversies "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and in "diversity of citizenship" cases between citizens of different states. 28 U.S.C. § 1332. Derivative actions generally "involve only issues of state law and, as in the present case, can get into federal courts only by reason of diversity in citizenship of the

parties." Koster, 330 U.S. at 522. When a court's subject matter jurisdiction is grounded in diversity, as in this case, "the joinder of a nondiverse party is not feasible because such joinder destroys the court's subject matter jurisdiction." Picciotto, 512 F.3d at 17. Thus, the Court now determines whether the LLC's are nondiverse parties.

"The statutory grant of federal jurisdiction in diversity cases gives district courts 'original jurisdiction of all civil actions where the matter in controversy . . . is between . . . citizens of different States.' 28 U.S.C. § 1332(a). This statutory grant requires complete diversity between the plaintiffs and defendants in an action. Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806)." Picciotto, 512 F.3d at 17. For jurisdictional purposes, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c); see also Gabriel, 396 F.3d at 14 (citing 28 U.S.C. § 1332). The word "State" includes the Commonwealth of Puerto Rico. 28 U.S.C. § 1332(e). While the defendants do not stipulate as to the LLC's principal place of business, their counterclaim alleges that the LLC's are created under Delaware law. (Docket No. 22 at 8). The amended complaint alleges that involuntary plaintiff

CPG similarly is a limited liability corporation organized and existing under Delaware laws. (Docket No. 36 at 2.) Because CPG and the LLC's are thus citizens of the same state, aligning them on opposite sides would destroy diversity jurisdiction. See Gabriel, 396 F.3d at 14; see also Smith v. Sperling, 354 U.S. 91, 93 (1957).

Although corporations generally are formally styled as defendants in derivative suits, the rule is "littered with caveats," Gabriel, 396 F.3d at 14, and it is the duty of lower federal courts to "look beyond the pleadings and arrange the parties according to their sides in the dispute." Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 69 (1941). Only after parties are aligned according to their actual interests "can a decision be made as to whether complete diversity exists." Gabriel, 396 F.3d at 14 (citing Indianapolis, 314 U.S. at 69). The Supreme Court's admonition that lower courts attempt to determine whether the corporation is adverse by ascertaining "the issue of antagonism on the face of the pleadings and by the nature of the controversy," Sperling, 354 U.S. at 97, has been followed by the First Circuit Court of Appeals. Gabriel, 396 F.3d at 16. Moreover, the First Circuit Court of Appeals has found that the logic in Sperling pertains to close corporations. Id.

Based on the facts contained in the pleadings, the Court concludes that the LLC's are closely aligned as counterclaimants with Sidney Becker, Wilma Becker Shapiro and Judith Becker Rubin (collectively here, "the Beckers"). From the face of the counterclaim, Mr. Torres-Caratini was in charge of the acquisition, development and operations of the LLC's with little or no involvement from the Beckers. (Docket No. 22 at 9.) Through at least eleven acts, omissions, and results, Mr. Torres-Caratini inadequately kept and consequently devalued the LLC's. Id. Although Mr. Torres-Caratini owns 5% in two of the LLC's, it is the Beckers, as the owners of 95% of two LLC's and 100% of the other two, who "enjoy the prerogative of deciding what is in the best interests of the company at the moment." See Gabriel, 396 F.3d at 16. So long as plaintiff TCI and Mr. Torres-Caratini's interests "are contrary to those interests, the plaintiff and the corporation are adverse for the purposes of determining the existence vel non of diversity jurisdiction." Id. (citing Sperling, 354 U.S. at 96-97). Because the Court finds that the LLC's are nondiverse, aligning the LLC's as counterclaimants with the Beckers and opposite CPG would destroy this Court's original subject matter jurisdiction grounded in diversity.

The Court's analysis does not stop here, however. The First Circuit Court of Appeals recently held that "28 U.S.C. § 1367, enacted in 1990, gives federal courts *supplemental* jurisdiction over both compulsory and at least some permissive counterclaims. This alters this circuit's former rule, adopted before the enactment of § 1367, that required permissive counterclaims to have an independent basis for jurisdiction." Global Naps, Inc. v. Verizon New Eng. Inc., 603 F.3d 71, 76 (1st Cir. 2010) (emphasis added). A district court thus has supplemental jurisdiction over a claim that is "so related to claims in the action within such original jurisdiction that [it] form[s] part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). That supplemental jurisdiction includes claims that involve joinder of additional parties, and § 1367(a) governs supplemental jurisdiction over counterclaims. Global Naps, 603 F.3d at 87.

"Article III's case-or-controversy standard is the jurisdictional limit for counterclaims." Global Naps, 603 F.3d at 87. The meaning of "case" and "controversy" has been the subject of much scholarly debate, and "the question is a difficult one." Id. The First Circuit Court of Appeals, however, has decided to approach an Article III "case" by looking to "whether

the claims arose from a 'common nucleus of operative fact.'" Id. at 88 (citing United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)). Accordingly, this Court looks to whether defendants' counterclaim arose from a "common nucleus of operative fact" with plaintiffs' amended complaint in order to determine whether it may exercise supplemental jurisdiction over the counterclaim. See Global Naps, 603 F.3d at 88.

Defendants' counterclaim is not sufficiently related to the underlying litigation to fall within Article III's jurisdiction. The only facts that both the complaint and counterclaim identify are the residencies of the co-defendants, background information on TCI, Mr. Torres-Caratini and the four LLC's, and the defendants' and plaintiffs' ownership shares in the LLC's. (Docket No. 36; Docket No. 22.) While the amended complaint contains one paragraph mentioning TCI's management of the LLC's business affairs and the administration of the shopping centers between August 1998 and December 2008, (Docket No. 36 at 3), it includes no factual allegations regarding Mr. Torres-Caratini's management actions. Defendants' counterclaim, in contrast, dedicates four pages (of its total five and half) to describe Mr. Torres-Caratini's actions, supervision, and control over the LLC's. (Docket No. 22 at 9-12.) The counterclaim alleges

facts, that occurred during a span of more than ten years, beginning in 1997, regarding the mismanagement and devaluation of the LLC's, the commissions paid to Mr. Torres-Caratini, and the fiduciary duties owed by Mr. Torres-Caratini. Id. The amended complaint, in contrast, contains no such common facts, but rather sets forth allegations pertaining to defendants' willingness to sell their Puerto Rico properties in 2003, the negotiations engaged in during August-December, 2007, and an alleged breach of contract that occurred sometime after December 4, 2007. (Docket No. 36 at 3-5.) The facts in the counterclaim thus are not sufficiently related to plaintiffs' breach of contract claim so as to share a common nucleus of operative fact. See Global Naps, 603 F.3d at 85 (finding a counterclaim "more than sufficiently related to [a] complaint [where] [b]oth parties' claims ultimately [arose] from a dispute over the same agreement and involve[d] the same basic factual question"); see also 6 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1410, at n.10 (1990) (A "counterclaim arises from the same aggregate set of operative facts as the initial claim . . . [when] the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant.")

While a counterclaim and an amended complaint need not allege "precisely identical" facts, and a counterclaim may "embrace additional allegations," Moore v. New York Cotton Exchange, 270 U.S. 593, 610 (1926), to constitute a common nucleus of operative fact "the essential facts giving rise to the claims asserted" should be a constant factor in both pleadings. See Nesglo, Inc. v. Chase Manhattan Bank, N.A., 562 F. Supp. 1029, 1041 (D.P.R. 1983); see also Moore, 270 U.S. at 610 (finding federal jurisdiction proper because the counterclaim and the complaint arose from the same transaction upon which the plaintiff based its complaint). Here, none of the circumstances alleged in the amended complaint is "an important part of the transaction constituting the subject-matter of the counterclaim," and no "[e]ssential facts alleged by [plaintiffs] enter into [or] constitute in part the cause of action set forth in the counterclaim." See Moore, 270 U.S. at 610. Aside from the fact that both claims involve TCI, co-defendants, and the LLC's, the Court finds nothing that indicates that the allegations contained in the counterclaim arise from the same nucleus of operative fact as the allegations in the amended complaint. Accordingly, the Court lacks supplemental jurisdiction over defendants' counterclaim. Because joinder would destroy

subject matter jurisdiction, therefore, said joinder is thus not feasible under Rule 19(a).

**3. INDISPENSABILITY PURSUANT TO RULE 19(b)**

Although the LLC's cannot be joined in the action without divesting the court of subject-matter jurisdiction, "Rule 19(b) lays out additional criteria for determining whether that party is 'indispensable.'" Jimenez v. Rodriguez-Pagan, 597 F.3d 18, 25 (1st Cir. 2010). The critical question in the Rule 19(b) context is "'whether in equity and good conscience' the action may proceed in [the party]'s absence." (citing B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 516 F.3d 18, 23 (1st Cir. 2008)). (quoting Fed.R.Civ.P. 19(b)).

> To answer that question, the district court must consider four factors specified in the Rule: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Jimenez, 597 F.3d at 25 (citing Fed.R.Civ.P. 19(b)). If the court finds that the litigation cannot proceed in the party's absence, the court must dismiss the case. Id. at 25 (citing B. Fernandez, 516 F.3d at 23.

As mentioned above, a corporation is an indispensable party to a derivative suit. Koster, 330 U.S. at 522; see also Gabriel, 396 F.3d at 14. A derivative action must proceed with a corporation, because by definition, the action itself derives its existence from the rights of the corporation, not those of the shareholder plaintiff. As such, defendants' counterclaim cannot move forward without joining the LLC's as parties.

For the reasons set forth above, joinder of the necessary party LLC's is not feasible under Rule 19(a). Because the LLC's are also indispensable parties pursuant to Rule 19(b), the action cannot proceed without them. See Picciotto, 512 F.3d at 20 ("By definition, the Rule 19(b) indispensability determination means that there is no viable lawsuit without the missing party.") Because original jurisdiction in this case is grounded in diversity of citizenship, "the absence of a nondiverse, indispensable party is not a mere procedural defect. Rather, it destroys the district court's original subject matter jurisdiction." See id. Accordingly, the Court **GRANTS** plaintiffs' motion to dismiss defendants' counterclaim pursuant to Rule 19.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6). Plaintiffs' claims against the defendants may go forward. The Court hereby **DISMISSES WITHOUT PREJUDICE** defendants' counterclaim.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, June 28, 2010.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE